```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                   GAINESVILLE DIVISION

3

4
UNITED STATES OF AMERICA,    )
5          Plaintiff,        )
                             )
6   -vs-                     )   Indictment
                             )   No. 2:20-CR-023-SCJ-JCF
7   JESSE JAMES SMALLWOOD (1),  )
          Defendant.         )
8

9

10

11              Transcript of the Motions
          Before the Honorable J. Clay Fuller,
12     United States District Court Magistrate Judge
                    April 28, 2021
13              Gainesville, Georgia

14

15

16
APPEARANCES OF COUNSEL:
17
   On behalf of
18 the Government:          Gregory E. Radics,
                            Assistant United States Attorney
19

20 On behalf of
   the Defendant:          Judy A. Fleming, Esq.
21

22

23 Reported stenographically by:
   Amanda Lohnaas, Official Court Reporter
24 United States District Court
   Atlanta, Georgia
25 (404) 215-1546
```

1                          INDEX OF WITNESSES

2     Witnesses for the Government:

3     Andrew Shoemaker
                Direct Examination                      6
4               Cross-Examination                       20

5     Israel Cazares
                Direct Examination                      37
6               Cross-Examination                       64
                Redirect Examination                    86
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Wednesday, April 28, 2021, 10:25 a.m.; Gainesville,

2     Georgia.)

3          THE COURT:  Good morning, y'all may be seated.

4          MR. RADICS:  Good morning.

5          MS. FLEMING:  Good morning, Your Honor.

6          THE COURT:  All right, we're here on 2:20-CR-23, United

7     States versus Jesse James Smallwood.

8          Before we begin with our suppression hearing I'd like to

9     take a minute to address Mr. Smallwood on him being late this

10    morning and to do this I'd like to ask y'all to step out just

11    a moment.

12         And you don't need to take this down, if that's all

13    right.

14         (Discussion off the record.)

15         THE COURT:  All right, we're on the record now and I'd

16    asked counsel to state your appearances for the record and

17    then we'll give Mr. Radics an opportunity to give me a little

18    overview of today's proceeding if he wishes or he can just

19    jump right in.

20         MR. RADICS:  Yes, Your Honor, good morning.  Greg Radics

21    for the United States.  With me is Special Agent Mike Baldino

22    from the Federal Bureau of Investigation.

23         And overview of the motion to suppress, it's a

24    generalized motion, it's not particularized in view of the

25    government.  I believe, after speaking to Ms. Fleming that

1    the motion relates to that they're trying to suppress

2    evidence obtained from search of a vehicle.

3         The government's position is that this was, number one,

4    a police-citizen encounter and he was asked consent to

5    search, which he voluntarily gave.

6         Falling back, if it's not a police-citizen encounter,

7    it's definitely an encounter involving reasonable suspicion

8    under Terry based upon the call-outs for a vehicle matching

9    that description with the number of occupants in it where

10   there had been a recent shooting approximately 40 minutes

11   before of a police car just near, five miles away, and it was

12   in the early morning hours.

13        So we do have a video that we're going to try to show to

14   the Court, very short minute and a half where the officer

15   approaches the driver of the vehicle, who is the defendant

16   Smallwood, asks if he can search the vehicle.  Defendant

17   Smallwood is out of his car and says, "Yes, you can search my

18   car."  So our position is it's a consent search.

19        I do have something I would like to put on the record

20   that doesn't relate to this motion to suppress at all but

21   it's something that may become relevant later, and that is

22   that the government has offered the defendant, made the

23   defendant a plea offer to close his case to a plea of guilty

24   to Count One with a recommendation of a within guideline

25   sentence.

1      The importance of that is that Count Two carries a

2  mandatory five-year consecutive sentence.  And he has chosen

3  not to accept that plea offer and so we're continuing with

4  the motion to suppress and we'll not be offering that plea

5  after today.

6      THE COURT:  Okay, fair enough.

7      Ms. Fleming, did you have anything you wanted to share

8  at this time?

9      MS. FLEMING:  Just my appearance for the record, Judy

10  Fleming representing Mr. Smallwood, who is here present in

11  the court.

12      I'd like to invoke the rule of sequestration before we

13  get started.

14      THE COURT:  Fair enough.

15      MR. RADICS:  We intend to call two witnesses, Officer

16  Shoemaker and Officer Cazares.  Officer Cazares is outside

17  and we'll call Officer Shoemaker to the stand, if it's the

18  right time now.

19      THE COURT:  That works.

20      THE COURTROOM DEPUTY:  Please raise your right hand.

21                      ANDREW SHOEMAKER,

22  having been first duly sworn or affirmed, was examined and

23  testified as follows:

24      THE COURTROOM DEPUTY:  Please state your full name,

25  spell your last name for the record.

1        THE WITNESS:  Officer Andrew Shoemaker,

2   S-h-o-e-m-a-k-e-r.

3        MR. RADICS:  Judge, would you like me to remain at the

4   table or can I use the --

5        THE COURT:  I'm fine if you want to use the lectern.

6        MR. RADICS:  Thank you.

7                        DIRECT EXAMINATION

8   BY MR. RADICS:

9   Q.   Good morning, Officer Shoemaker.  You've been sworn,

10  correct?

11  A.   Yes, sir.

12  Q.   Can you state your full name for the Court, please?

13  A.   Officer Andrew Jeffrey Shoemaker.

14  Q.   And how are you employed?

15  A.   Through Gainesville Police Department.

16  Q.   And how long have you been employed in that capacity?

17  A.   Since December of 2017.

18  Q.   And what's your title?

19  A.   Police officer.

20  Q.   And you've been a police officer, is Gainesville Police

21  Department also known as GPD?

22  A.   Yes, sir.

23  Q.   How long have you been a GPD police officer?

24  A.   I've been a sworn member since March of 2018.

25  Q.   And what are your duties typically as a Gainesville

1   police officer when you're on duty?

2   A.   I serve in patrol division, so I respond to general

3   calls to service, handle wrecks and any other nature that

4   arises.

5   Q.   Okay.  And when you're on patrol are you in a marked

6   patrol vehicle?

7   A.   I am.

8   Q.   And it's a vehicle with emergency lights and things like

9   that?

10  A.   It is.

11  Q.   And you pull over people who commit traffic violations

12  also?

13  A.   Yes, sir.

14  Q.   And were you working in your capacity as a member of GPD

15  as a patrol officer on or about June 2nd, 2020, in the early

16  morning hours?

17  A.   I was.

18  Q.   And what was your shift that night, do you recall?  Or

19  that morning.

20  A.   So it was that night, I was working a modified schedule

21  with the (inaudible) field force, basically due to the

22  previous riots.  At that time I was about to go home, the

23  call came out, due to my shift was about to end and I was

24  sitting, before I left I was sitting at Browns Bridge and

25  Pearl Nix waiting to be cleared to go off duty.

1   Q.   What time were you supposed to go off duty?

2   A.   Shortly after midnight, between 1:00 and 2:00.

3   Q.   Did you go off duty?

4   A.   I did not.

5   Q.   And why is that?

6   A.   Shortly after 1:00 a.m. a call came out about a

7   suspicious call on Paces Court.  The caller said that she

8   heard a noise, looked outside and there was a patrol car set

9   on fire.

10  Q.   How did that call come out?  Was it a call came to you

11  or a call came somewhere else?

12  A.   I saw the call pop on our screen because we get call,

13  dispatched to us over the radio.  We also have a silent

14  dispatch, I had my computer up with that software open.  I

15  saw the --

16       THE COURT:  Officer Shoemaker, I think it would be

17  helpful for the court reporter if you could slow down a

18  little.  I know you know what you're going to say and it's

19  easy to get it out, but especially with masks on --

20       THE COURT REPORTER:  The mask makes it very difficult.

21       THE WITNESS:  Yes, Your Honor.  My apologies.

22  Q.   (By Mr. Radics)  You were in your patrol vehicle when

23  you noticed that a call came from dispatch that there was an

24  incident at Paces Court apartments?

25  A.   Yes, sir.

```
 1   Q.   Do you know, recall what time that information came to
 2   you?
 3   A.   It was shortly after 1:00 a.m., I believe it was around
 4   1:11.
 5   Q.   Okay.  And did that cause you to act in any way
 6   receiving that information?
 7   A.   It did.  I knew that the courtesy officer did live there
 8   and he had a marked patrol car in the parking lot and so I
 9   then began making my way to Paces Court.
10   Q.   So what is Paces Court?
11   A.   It's an apartment complex off Spring Haven.
12   Q.   And what city?
13   A.   Gainesville.
14   Q.   Gainesville, Georgia?
15   A.   Yes, sir.
16   Q.   And is Gainesville, Georgia located in the Northern
17   District of Georgia?
18   A.   Yes, sir.
19   Q.   All right.  So did you go to that location at Paces
20   Court?
21   A.   Yes, sir.
22   Q.   Do you know the address of that?
23   A.   I do not know the exact numbers, no, sir.
24   Q.   Okay.  What is the main road that's off of?
25   A.   It's off of Browns Bridge, you then turn onto Skelton,
```

1    then Spring Haven, and then you arrive at Paces Court.

2    Q.    You said at this Paces Court apartment complex there was

3    a courtesy vehicle.  What's a courtesy vehicle?

4    A.    It's one of our members of the Gainesville Police

5    Department that has a contract with the apartment complexes.

6    They do general security for where they live at, so it was a

7    marked Gainesville Police Department vehicle.

8    Q.    And who was the courtesy officer that lived there?

9    A.    Officer Honea.

10   Q.    How long did it take you to get to that location at

11   Paces Court, approximately, when you received a call at 1:11

12   a.m.?

13   A.    I would say three to four minutes.

14   Q.    What, if anything, happened when you arrived at the

15   location at Paces Court apartments?

16   A.    As I was coming down Spring Haven I saw a white

17   passenger car in the area.  I had no reason to believe they

18   were involved.  I did let dispatch know there was a white

19   Ford passenger car leaving.

20   Q.    And how did you let dispatch know?

21   A.    Over the radio.

22   Q.    And approximately what time did you let them know?  Was

23   it contemporaneously with the time you arrived there?

24   A.    Yes, sir.  They were near the intersection of Spring

25   Haven, the beginning of Paces Court, so it would have been

1    around 1:15.

2    Q.   And what happened next when you arrived there?

3    A.   I then saw the patrol car that was set on fire, there

4    was a fire in the trunk, a lot smoke coming out.  I then got

5    my fire extinguisher out of my trunk, busted the back lights

6    out some more so I could properly ventilate it and then

7    deployed the fire extinguisher.

8    Q.   And did deploying the fire extinguisher put out any

9    fire?

10   A.   Yes, it did.

11   Q.   All right.  And did you do that immediately after --

12   A.   Yes.

13   Q.   -- pulling up there around 1:15?  Who else was there, if

14   anyone, when you did this?

15   A.   I was by myself at that time.  Shortly after I ran my

16   fire extinguisher empty other officers arrived on scene, I

17   believe it was Officer Schiffer and Officer Lowery.  They

18   brought their fire extinguishers as well but they were not

19   needed.

20   Q.   And how long did you -- did you remain at that location

21   at Paces Court by the police car or did you go somewhere

22   else?

23   A.   Once my supervisor Sergeant Jones arrived on scene and

24   other officers were there to take a report, I then began

25   going around searching other areas and we sent officers to

1    other apartment complexes where we knew that patrol officers

2    lived.

3    Q.   Can I ask you to slow down?

4    A.   Yes, sir.

5    Q.   So you said after you put out the fire your supervisor

6    Sergeant Jones arrived?

7    A.   Yes, sir.

8    Q.   And what was -- what were the duties of Sergeant Jones

9    upon his arrival, do you know?

10   A.   He called for the wrecker to come get the vehicle.

11   Q.   Not necessarily what he did, what was --

12   A.   He's our supervisor of the patrol units.

13   Q.   Okay.  And were you directed to do anything in

14   particular that caused you to act in any way?

15   A.   He told me to go ahead and begin canvassing the area.

16   Q.   Okay.  What were you canvassing the area for?

17   A.   So after I left, he came out after talking to the

18   caller, gave out a description of an older model vehicle,

19   classic vehicle, about the size of an Impala with

20   approximately four males, four, five males in the vehicle.

21   Q.   Any color to that description?

22   A.   Dark in color.

23   Q.   So do you recall when that -- what do you call a

24   call-out?  Do you call it a call-out or do you call it

25   something else?

1   A.   A BOLO, be on the lookout.

2   Q.   Is BOLO short for be on the lookout?

3   A.   Yes, sir.

4   Q.   Okay.  And was there a BOLO for what you just described?

5   A.   Yes, sir.

6   Q.   A classic, older looking, dark car?

7   A.   Yes, sir.

8   Q.   Was there any description about who or how many people

9   might be in that vehicle?

10  A.   They said there was approximately four to five males in

11  the car.

12  Q.   And that was the BOLO?

13  A.   Yes, sir.

14  Q.   And that caused you -- what did that cause you to do

15  when you received that BOLO?  Did it cause you to look for

16  anything in particular?

17  A.   For that model car and anyone matching the description

18  in and around the vehicle.

19  Q.   And did you drive -- where were you driving looking for

20  this car?

21  A.   I was going up and down Browns Bridge checking out

22  different gas stations and restaurants that were open late at

23  night.

24  Q.   Do you recall approximately what time you received the

25  BOLO for the older model dark car with multiple occupants?

1   A.   I do not.

2   Q.   Do you recall approximately how many minutes after 1:15

3   when you arrived that that came in?

4   A.   I would say it would have been probably within ten

5   minutes.  It was very soon after.

6   Q.   Very soon, all right.  And did you ever, in searching

7   for such a vehicle, did you ever find one that matched that

8   description?

9   A.   I did.

10   Q.   And where were you when you -- when that happened?

11   A.   At that time a second call came out on Browns -- excuse

12   me, Thompson Bridge, 1850 Thompson Bridge at Tap It.  A man

13   was walking his dog and -- around 1:40 -- and saw what he

14   thought was a flare or a firework shot up in the air and he

15   heard a gunshot.

16         At that time I was on Jesse Jewell so I began heading to

17   1850 Thompson Bridge and I saw a vehicle matching that

18   description at the intersection of E.E. Butler headed south

19   about to turn left onto Jesse Jewell traveling east.

20   Q.   So approximately how many minutes after you received

21   that call about the alleged shot at Tap It did you see this

22   vehicle matching the description?

23   A.   It had been probably 25, 30 minutes.

24   Q.   How did this vehicle match the description of the BOLO

25   that you received that caused you to leave the Paces

1  apartment complex?

2  A.   It was an older model black Crown Vic, which is about

3  the size of an older model Impala, and I saw four to five, I

4  thought it was four but it could be five later on, but there

5  was four individuals in the car.

6  Q.   Okay.  And where exactly did you see that?

7  A.   It was stopped at the red light at E.E. Butler waiting

8  to turn left traveling east on Jesse Jewell.

9  Q.   And approximately how many minutes or hours -- how long

10  was this after the time that you first pulled into the Paces

11  apartment complex, that you said was 1:15, approximately how

12  much after that did you see the vehicle at E.E. Butler?

13  A.   It had been about 25 to 30 minutes.

14  Q.   Do you recall any description of any of the -- can you

15  give a description of any of the people in the car?

16  A.   I saw there's a white male driver and the rest of the

17  windows were dark, I was not able to see them as I was making

18  my turn.

19  Q.   All right.  But were you able to see if there were other

20  passengers in there?

21  A.   Yes, sir.  I saw there was a front-seat passenger and

22  multiple occupants in the back seat.

23  Q.   And you said it was about 25 to 30 minutes after 1:15.

24  So would that be about 30 to 35 minutes after 1:11 when you

25  arrived at Paces?

1   A.   Yes, sir.

2   Q.   And did you follow that vehicle?

3   A.   I did not.

4   Q.   Why not?

5   A.   There were other officers coming behind me and I was

6   going back to the 1850 Thompson Bridge to make sure there's

7   not a building on fire at that time and I had other officers

8   that were in close proximity to me, behind me on Jesse Jewell

9   to stop the vehicle.

10  Q.   Okay.  So you were concerned about the call that came in

11  from Tap It --

12  A.   Yes, sir.

13  Q.   -- and that vehicle leaving?

14  A.   Yes, sir.

15  Q.   Okay, but did -- and you relayed the information.  How

16  did you relay that information that you saw a vehicle

17  matching that description?  Did you call it into dispatch?

18  A.   Yes, sir.  I called over the radio, which all patrol

19  officers are able to monitor, and there was a black Crown Vic

20  with a white male driver and four occupants on that

21  intersection of E.E. Butler and Jesse Jewell.

22  Q.   And when you chose not to follow that vehicle were you

23  able to see other police cars in the area?

24  A.   I did not see any but I heard them.  They called on the

25  radio saying they were close by.

1   Q.   Okay.  Is that address at E.E. Butler, is that in the

2   Northern District of Georgia, also in Gainesville, Georgia?

3   A.   Yes, sir.

4   Q.   What were your concerns in not following the car?  Why

5   did you choose to go to Tap It?  What were you concerned

6   about, if anything?

7   A.   I wanted to make sure there wasn't any evidence on

8   scene, the vehicle -- sorry, the building not being on fire,

9   and assuring there was no other -- not another vehicle

10   matching that description close by.

11   Q.   Why did you think the building might be on fire?

12   A.   Being that the patrol car was just set on fire and then

13   the call about the flare being shot near Tap It.

14   Q.   And what did you do after calling in that -- calling in

15   that description to dispatch?

16   A.   After I called in that description I made my way to Tap

17   It.  And it was -- everything was secure there, there were no

18   broken windows and nothing was on fire.

19   Q.   What is Tap It?

20   A.   It's a little, essentially a small bar on Thompson

21   Bridge.

22   Q.   And after you went to Tap It did you go anywhere else

23   that night or that early morning hour?

24   A.   After I concluded there, other officers had found the

25   vehicle I called out at QuikTrip and I made my way back to

1    the police department.

2    Q.    Okay.   And you said this was -- that you -- what time do

3    you think your call was when you saw that car matching the

4    description at E.E. Butler, if it was, you said it was about

5    30 to 35 minutes after 1:11 a.m.?

6    A.    Yes, sir, probably somewhere around 1:40.

7    Q.    1:40 a.m.?

8    A.    Yes, sir.

9    Q.    And have you patrolled -- how many times, approximately,

10   have you been on patrol in those type of hours?   Meaning very

11   late at night or very early in the morning hours.

12   A.    How often am I on patrol at that time?

13   Q.    Yes.

14   A.    Quite often.

15   Q.    Your regular shift?

16   A.    We rotate every four months.   At that time I had been on

17   for about three months.

18   Q.    So are you familiar with the traffic patterns at that

19   time of the morning at approximately 1:00 to 1:40 a.m.?

20   A.    Yes, sir.

21   Q.    And typically what are they like?

22   A.    They're generally very light, people going to and from

23   shift work, and truck drivers, generally.

24   Q.    How about on the date that we're talking about, June

25   2nd, at approximately 1:00 to 1:40, what was the traffic like

1    that early morning, if you remember?

2    A.    It was very light.

3    Q.    And approximately -- you said that a car matching the

4    description of the one you called out was stopped at a QT?

5    A.    Yes, sir.

6    Q.    Where is that QT?

7    A.    It's 1910 Jesse Jewell Parkway.

8    Q.    And that's in Gainesville in the Northern District?

9    A.    Yes, sir.

10   Q.    Approximately what is the distance between 1910 Jesse

11   Jewell Parkway QT and the apartment at Paces Court?

12   A.    It's approximately five miles.

13   Q.    How about the location of Paces Court and Tap It, the

14   small bar, do you know approximately how close in distance

15   those two locations are?

16   A.    I would say that's approximately around five miles as

17   well.

18   Q.    All right.  And approximately how far is it from the

19   location where you saw a car matching the description that

20   you called in to dispatch at E.E. Butler and the QT at 1910

21   Jesse Jewell?

22   A.    Approximately two miles.

23         MR. RADICS:  If I can have one moment, Your Honor.

24         THE COURT:  Sure.

25         (Pause in the proceedings.)

1       MR. RADICS:  Those are all my questions, Officer

2   Shoemaker.  Ms. Fleming may have some for you.  Thank you.

3                       CROSS-EXAMINATION

4   BY MS. FLEMING:

5   Q.   Good morning, Officer Shoemaker.

6   A.   Good morning.

7   Q.   I heard you testify that you were about to go off your

8   shift; is that right --

9   A.   Yes.

10  Q.   -- on the early morning hours of June 2nd, 2020?

11  A.   Yes, ma'am.

12  Q.   Okay.  What was your shift that day?

13  A.   Normally I work 6:00 to 6:00, 6:00 p.m. to 6:00 a.m.;

14  however, at this point in time I was working a modified

15  schedule due to the protests in town.  If I recall, I believe

16  it was around 1:00 p.m. to 1:00 a.m.

17  Q.   So when this occurred you were already off shift?

18  A.   Not yet.  I was waiting to go off shift, I still had a

19  few reports to get turned in so I was not off duty yet.

20  Q.   So is it fair to say you were on patrol that evening and

21  you were headed back to the police department to do your

22  paperwork, or do you do it in your car?

23  A.   In my vehicle.  I was sitting in the Pappy's Pawnshop,

24  Browns Bridge Road at Pearl Nix Parkway.

25  Q.   And you mentioned that you were on modified schedule

1  because of the protests that night of June 2nd; is that

2  right?

3  A.   Yes.

4  Q.   And you're referring to the protests because of the

5  George Floyd death?

6  A.   Yes, ma'am.

7  Q.   Okay.  Going back to that, because you brought it up, so

8  were there more patrol cars out on the road that night?

9  A.   There were a few of us on a modified schedule and kind

10  of sitting around waiting to see if any other protests were

11  to pop up.  I would say there would have been a handful more

12  but not too many more.

13  Q.   Okay.  Is it your understanding that your schedule was

14  modified because there was need for more police presence that

15  night?

16  A.   Yes, ma'am.

17  Q.   Were there a lot of protests going on that evening?

18  A.   That evening, no, ma'am.

19  Q.   That was at 6-1, June 1 was a Monday night, and 6-2 was

20  a Tuesday morning; is that right?

21  A.   I know the dates.  I'm not sure exactly what days they

22  were.

23  Q.   So there weren't a lot of protests that you recall, but

24  you do recall that there was more police presence because you

25  were aware of it?

1    A.    Yes, that's why I was working the modified schedule.

2    Q.    Okay, thank you.  Did you have your body cam on?

3    A.    I did.

4    Q.    At 1:15, 1:30 in the morning?

5    A.    When I arrived on scene it would have been turned on.

6    Q.    Do you turn it on yourself or is that automatic?

7    A.    I hit the button myself.  But if I turn on my blue

8    lights they turn on automatically.

9    Q.    And is that for all Gainesville Police Department

10   officers, you can turn on the blue light while you're in the

11   car, it goes on automatically?

12   A.    Not all of us because we're switching out camera

13   systems.  So I was in a newer police car with the new cameras

14   inside.

15   Q.    Newer mean in the past year?

16   A.    2020, yes, ma'am.

17   Q.    Did you also have, in addition to a body cam you turn

18   on, a dash cam?

19   A.    Yes, ma'am.

20   Q.    And does that go on automatically?

21   A.    If I turn my emergency lights on.

22   Q.    But you can also manually turn it on?

23   A.    Yes, ma'am.

24   Q.    So if an officer is parked but the car is still on, the

25   dash cam will not turn on if no blue lights are turned on?

1   A.   Correct.

2   Q.   All right.  You mentioned that you -- so I was a little

3   bit confused when you were testifying about how you arrived

4   at Paces Court.  Okay?

5   A.   Uh-huh.

6   Q.   You said you were the first officer on the scene --

7   A.   Yes.

8   Q.   -- at Paces Court and you went to the marked police car

9   that had fire and smoke coming out of it, is that what you

10  testified to?

11  A.   Yes.

12  Q.   You pulled out a fire extinguisher, right?

13  A.   Yes, ma'am.

14  Q.   And nobody else was around; is that right?

15  A.   Not that I saw, no, ma'am.

16  Q.   Okay.  For how long were you the only one there?

17  A.   Just a few moments until other officers arrived on

18  scene.

19  Q.   But there were no other witnesses?

20  A.   None that I saw at the moment.  The initial response was

21  to get the fire gone.

22  Q.   You didn't see any people standing around because you

23  would have noticed that as a police officer, right?

24  A.   Yes, ma'am.

25  Q.   You're trained to look for people standing around?

1   A.    Yes, ma'am.

2   Q.    And if there's a fire, you're going to be concerned that

3   it might create --

4   A.    Due to the (inaudible) --

5         THE COURT REPORTER:  I'm sorry, can you repeat that?

6         THE WITNESS:  Yes, ma'am.  And then due to the knowing

7   there's munitions in patrol cars, ammo, whatnot, I was trying

8   to get the fires out before anything could arise due to that.

9   Q.    (By Ms. Fleming)  And you had been with the Gainesville

10  Police Department since 2017; is that right?

11  A.    Yes.  I was hired December of 2017.

12  Q.    But how long have you been a police officer?

13  A.    I've been a sworn member since March of 2018.

14  Q.    Okay.  So this is your first job as a police officer --

15  A.    Yes, ma'am.

16  Q.    -- is that right?

17  A.    Yes.

18  Q.    All right.  And you go through training, I assume?

19  A.    Yes, ma'am.

20  Q.    You go through training once a year?  Once a month?  How

21  often?

22  A.    So we have yearly training we have to get done and

23  there's other training that they may put forth throughout the

24  year depending on what the training staff deems --

25  Q.    And --

1   A.    -- needed.

2   Q.    Sorry, didn't mean to talk over you.  And is it my

3   understanding, am I correct that you are a patrol officer?

4   A.    Yes.

5   Q.    So that translates to you travel in your vehicle; is

6   that right?

7   A.    Yes.

8   Q.    Through a certain geographical location?

9   A.    Yes, through the city of Gainesville.

10   Q.    Okay.  Is that what you do today?

11   A.    Say that again.

12   Q.    Is today, in April of 2021, are those duties --

13   A.    Yes, ma'am.

14   Q.    -- today as well?

15   A.    Yes, ma'am.

16   Q.    Those were the same duties you had on June 20th -- June

17   2nd of 2020; is that right?

18   A.    Yes.

19   Q.    So since June of 2020, I am going to presume that you've

20   been on duty working a modified schedule or a regular

21   schedule for the past ten months pretty regularly; is that

22   right?

23   A.    Yes, ma'am.

24   Q.    Have you taken any leaves of absence?

25   A.    Yes, ma'am.

1   Q.   How long?

2   A.   I had a month in January for military leave and a

3   vacation a couple of weeks ago.

4   Q.   Okay.  But with the exception of that month in January,

5   which was three months ago, you've been on duty pretty

6   regularly?

7   A.   Yes, ma'am.

8   Q.   How many shifts do you work a week?

9   A.   It varies week to week.  So one week they have a long

10   week, I'll work Monday, Tuesday, Friday, Saturday, Sunday.

11   The following week I'll work Wednesday, Thursday, and it

12   falls back and forth.

13   Q.   Is it fair to say you work at least 40 hours a week?

14   A.   Yes.

15   Q.   Do you work more than 40 hours a week?

16   A.   So one week we'll have 24 hours and the next week we'll

17   have 60, being an 84-hour pay period.

18   Q.   During that 20 to 40 to 60 hours is it fair to say that

19   you patrol in your police car and you stop people when you

20   see something that causes suspicion for you?

21   A.   Yes, ma'am.

22   Q.   So since June of 2020, you've made many stops; is that

23   right?

24   A.   Yes, ma'am.

25   Q.   You've encountered many citizens?

 1   A.   Yes, ma'am.

 2   Q.   You've approached many people?

 3   A.   Yes, ma'am.

 4   Q.   And you talked to many citizens within the city of

 5   Gainesville, I would assume?

 6   A.   I have.

 7   Q.   Have you reviewed your reports before you came to court

 8   today?

 9   A.   I did look over it, yes, ma'am.

10   Q.   How many reports did you personally author?

11   A.   For this incident or --

12   Q.   Yes.

13   A.   I checked out myself to show -- my small supplemental

14   report, which goes with the overall incident report, that's

15   what I reviewed.

16   Q.   That's the only thing you reviewed?

17   A.   And then our CAD report.

18   Q.   Your CAD --

19   A.   Through dispatch.

20   Q.   Okay.  Did you review anything else in preparation for

21   today?

22   A.   And body cam footage.

23   Q.   Of?

24   A.   Of myself and other officers on scene.

25   Q.   There were several body cam footages, if you will, in

1   this case.  How many did you review?

2   A.   I recall reviewing myself and Officer Cazares's body

3   camera.

4   Q.   So you had a body cam that night?

5   A.   Yes.

6   Q.   On?

7   A.   It should have been activated.

8   Q.   Okay, you just said you reviewed it.

9   A.   Yes.

10  Q.   Okay, so it is something that's recorded?

11  A.   It should have been, yes, ma'am.

12  Q.   Okay.

13       MS. FLEMING:  Your Honor, at this time I'm going to

14  request all reports, all body cams, including what Officer

15  Shoemaker's described.  I don't think I have Officer

16  Shoemaker's body cam.

17       THE COURT:  Sounds like something --

18       MS. FLEMING:  Sorry.

19       THE COURT:  Sounds like something she should have.

20       MS. FLEMING:  And the reports pursuant to Rule 26.2,

21  please.

22       MR. RADICS:  Judge, the government believes we've turned

23  it over but I have another copy I can give Ms. Fleming right

24  now of that report.  And Special Agent Baldino says that

25  there is a body cam footage that was turned over; we can show

1   that to her.

2       THE COURT:  Would y'all like to take like about a

3   five-minute break and we can make a copy of that report for

4   Ms. Fleming to review and she can review the body cam footage

5   in question that Agent Baldino says was turned over?

6       MR. RADICS:  That would be fine, Your Honor.

7       THE COURT:  And then we can resume.

8       AGENT BALDINO:  For Officer Shoemaker it's approximately

9   11 minutes.

10      THE COURT:  Do you want to go ahead and watch it?

11      MS. FLEMING:  If I may.

12      THE COURT:  Let's take a 15-minute break, let you do

13  that.  Ms. Klimenko will make any copies y'all need.

14      I will remind Officer Shoemaker that you're under oath

15  and you should not discuss your testimony and the subject

16  matter of any of that with anybody during this break.

17      THE WITNESS:  Yes, sir.

18      THE COURT:  And we will come back on the record at 11:15

19  unless Ms. Fleming needs more time.

20      MS. FLEMING:  Thank you, Your Honor.

21      THE COURT:  Sure.

22      (Recess, 11:00 a.m. to 11:15 a.m.)

23      THE COURT:  All right, ready to proceed?

24      MS. FLEMING:  Thank you, Your Honor.  Your Honor, the

25  court reporter has asked if I take my mask off, is that okay,

1   so she can hear me more clearly?

2       THE COURT:  I think -- I don't know whether we have

3   discretion to do that.

4       THE COURT REPORTER:  Judge Story says everybody who

5   comes up to the podium can take their mask off.

6       THE COURT:  That's all I need.  Yes.

7       THE COURT REPORTER:  If they're comfortable with it.

8   Q.   (By Ms. Fleming)  Officer Shoemaker, so you had just one

9   body cam video from the night of June 2nd, 2020; is that

10  right?

11  A.   Yes, ma'am.

12  Q.   Okay.  And is it fair to say that since June 2nd of

13  2020, you have made many stops and encountered many citizens

14  for various reasons during your shifts as a police officer?

15  A.   Yes, ma'am.

16  Q.   So from Paces Court Landing, where you took the fire

17  extinguisher out and sprayed it at the police car, how long

18  were you there?

19  A.   I do not recall my exact time.

20  Q.   Do you remember where you went directly after that?

21  A.   Once other officers were on the scene and Sergeant Jones

22  was on the scene, I then left and began driving up and down

23  Browns Bridge and Jesse Jewell.

24  Q.   Okay.  And that's when you testified earlier that you

25  heard a description come over the CAD; is that right?

1   A.   Sometime between when I was leaving and then, yes.

2   Q.   Okay.  But before then, when you were at Paces Court,

3   there was a description of a white Ford or a white pickup

4   truck; is that right?

5   A.   There was a --

6   Q.   Sorry, white Ford passenger car leaving the area.

7   A.   Yes.

8   Q.   And there's a voice on the body cam video that says Ford

9   Fusion; is that yours?

10   A.   I believe so.

11   Q.   Did you see the white Ford?

12   A.   I was the one that called out when I was driving on the

13   scene.

14   Q.   Okay, so this is what you were testifying earlier to

15   that as you were arriving at Paces Court you saw a white Ford

16   leaving?

17   A.   Yes, ma'am.

18   Q.   Okay.  And then you testified that you heard another

19   description come over the radio and that was the older model

20   Crown Vic?

21   A.   Older model classic car.

22   Q.   Classic car, okay.  And there was no other description

23   attached to that older model classic car?

24   A.   Older model classic car, possibly a four-door.  They

25   said it was dark windows, about the size, like an Impala,

1  general size, with multiple male occupants.

2  Q.   But there was no information about whether the windows

3  were up or down; is that right?

4  A.   Not that I recall.

5  Q.   And there was no information about whether it was the

6  same color on top and the bottom?

7  A.   Not that I recall.

8  Q.   And there was no information about the occupants of that

9  vehicle, was there?

10  A.   Other than just multiple occupants.

11  Q.   But no information about color of their skin, right?

12  A.   Not that I recall.

13  Q.   Whether -- what color clothing they were wearing; is

14  that right?

15  A.   No.

16  Q.   Whether they had any facial hair; is that right?

17  A.   Not that I recall.

18  Q.   Whether they had any hats or glasses?

19  A.   Not that I recall.

20  Q.   And based on that, you testified earlier that you saw a

21  car fitting that description?

22  A.   Yes.

23  Q.   Okay.  And that car was headed in what direction?

24  A.   It was stopped.  It was on E.E. Butler headed south,

25  stopped at the red light, about to turn left traveling east

1   on Jesse Jewell Parkway.

2   Q.   And you testified earlier, if I'm not mistaken, that you

3   chose not to follow it?

4   A.   That's correct.

5   Q.   So you don't know where that car went?

6   A.   Other than going east on Jesse Jewell.

7   Q.   You don't know where it ended up?

8   A.   Not until other officers got on the vehicle matching the

9   description.

10  Q.   Well, you don't know --

11  A.   I did not follow the car, no, ma'am.

12  Q.   From your personal knowledge, the car that you described

13  stopped at that light just now, you don't know where that car

14  ended up; is that correct?

15  A.   That is correct.

16  Q.   You don't know if that car was the actual car that was

17  found at the QT; is that right?

18  A.   That is correct.

19  Q.   And then you testified earlier that there was a witness

20  call about 1850 Thompson Bridge; is that right?

21  A.   Yes.

22  Q.   And you said that that's where that small bar called Tap

23  It was?

24  A.   Yes, ma'am.

25  Q.   And that's about five miles from where you saw the car

1    stopped at the light; is that right?

2    A.   I would say from Paces Court going down --

3    Q.   No, not from Paces Court; from where you saw the car you

4    just described stopped at the light.

5    A.   The car from Tap It?

6    Q.   No.  The car you just described that you said you saw on

7    E.E. Butler headed south stopped at the light.

8    A.   Yes.

9    Q.   So from that stoplight to Tap It was about five miles;

10   is that right?

11   A.   No, ma'am.  That car to Tap It, I would say is a mile

12   and a half to two miles, approximately.

13   Q.   Okay.  Did you see other officers behind you when you

14   were stopped at the light?

15   A.   I was not stopped at the light; I had the green light.

16   But when I called out the description other officers called

17   the radio saying they were in the area.

18   Q.   But you didn't actually see any other officers?

19   A.   I did not.  I was looking forward as I was driving.

20   Q.   Okay.  At any time, Officer Shoemaker, did you speak to

21   my client, Jesse Smallwood?

22   A.   No, ma'am.

23   Q.   At any time did you search the car that was stopped at

24   the QT on June 2nd?

25   A.   No, ma'am.  I was not on scene then.

1    Q.   So you've never had a conversation with Jesse Smallwood;

2    is that right?

3    A.   Not to my recollection, no, ma'am.

4    Q.   If you didn't recall, would you have written it down

5    somewhere?

6    A.   If I had spoken somewhere I would have.  But the night

7    in question I was not on scene at the QuikTrip.

8    Q.   Okay.  I'm just trying to get, I know it was ten months

9    ago, I'm just trying to get your recollection and I'm going

10   by what you told us before, that you wrote one report that

11   was attached to the report in this case, which was called the

12   case supplemental report, I think you called it?

13   A.   Yes, ma'am, a supplemental report.

14   Q.   That's the only report that you authored in this case;

15   is that right?

16   A.   That is as far as I recall, yes, ma'am.

17   Q.   So you never interviewed my client at any other time?

18   A.   No, ma'am.

19   Q.   Thank you.

20        MR. RADICS:  No questions, Your Honor.

21        THE COURT:  All right.  Thank you, Officer Shoemaker,

22   you may be excused.

23        MR. RADICS:  Judge, may he be excused?

24        THE COURT:  Yes, I just said so.

25        MR. RADICS:  Thank you.

1        Judge, before he comes in, we have a very short video

2   we'd like to show you from the special agent that he has on

3   his computer.  I believe Ms. Fleming has stipulated to

4   (inaudible) --

5        THE COURT REPORTER:  I'm sorry?

6        MR. RADICS:  We have talked about playing the video and

7   I'd like to lay the foundation with Officer Cazares, and then

8   hand the computer up to the Court.  Then I will file a disk

9   with that video on it as soon as possible.

10       THE COURT:  Any objection to proceeding that way,

11  Ms. Fleming?

12       MS. FLEMING:  No, Your Honor.

13       THE COURT:  Okay.  Is the video going to be helpful for

14  me to understand the subsequent testimony?  Because I mean,

15  if y'all are stipulating to the admission I can just wait and

16  look at it when you give me a disk.  Normally --

17       MR. RADICS:  I don't think it will help understand it;

18  it will just show.

19       THE COURT:  Let's do it this way, then.  Unless it's

20  going to help me understand his testimony today, you can lay

21  your foundation, move for the admission of it, Ms. Fleming

22  can do what she says she's going to do, and then we'll let

23  you come back and submit the copy that we can then review in

24  chambers once everything is briefed up, if that makes sense.

25  If there's a reason to proceed in another way let me know but

1   I'm fine with doing it the way I just laid it out.

2        MR. RADICS:  That sounds good, Your Honor.  We call

3   Officer Cazares as our next witness.

4        THE COURTROOM DEPUTY:  Please raise your right hand.

5                         ISRAEL CAZARES,

6   having been first duly sworn or affirmed, was examined and

7   testified as follows:

8        THE COURTROOM DEPUTY:  Please state your full name and

9   spell your last name for the record.

10       THE WITNESS:  Israel Cazares, last name is

11  C-a-z-a-r-e-s.

12                     DIRECT EXAMINATION

13  BY MR. RADICS:

14  Q.   And how are you employed, Officer Cazares?

15  A.   Sorry, what was the question?

16  Q.   How are you employed?

17  A.   I work for City of Gainesville Police Department.

18  Q.   And how long have you been employed in that capacity?

19  A.   Three years in May.

20  Q.   And what is your job description?  What are your duties

21  when you're working?

22  A.   I'm a patrol officer, have to answer (inaudible) --

23       THE COURT REPORTER:  I'm sorry, can you speak up,

24  please?

25       THE WITNESS:  Yes.  I'm a patrol officer, handle 911

1  calls, calls for service, emergency calls.

2       THE COURT:  Officer Cazares, the microphone can probably

3  be pulled down a little closer to you, that might make it a

4  little easier.

5  Q.   (By Mr. Radics)  Or you can scoot your chair up, maybe.

6       THE COURT:  It doesn't.

7  Q.   (By Mr. Radics)  It is a little hard to hear in masks.

8  A.   Okay.

9  Q.   If you can speak up and speak slowly since it's being

10  recorded.

11  A.   Okay.

12  Q.   And your duties as a patrol officer for Gainesville

13  Police Department are what?

14  A.   To handle 911 emergency calls and nonemergency calls for

15  service.

16  Q.   Is Gainesville Police Department also called GPD?

17  A.   Yes, it is.

18  Q.   And what is your jurisdiction?

19  A.   City limits of Gainesville.

20  Q.   City limits of Gainesville, and does that include

21  portions of 985 too?

22  A.   It does.

23  Q.   And is the city of Gainesville located in the Northern

24  District of Georgia?

25  A.   Yes.

1    Q.   Were you on patrol on duty on the date June 2nd, 2020?

2    A.   Yes, I was.

3    Q.   And were you specifically working in the early morning

4    hours shortly after midnight?

5    A.   Yes, I was.

6    Q.   And were you working in the capacity as a patrol officer

7    that day?

8    A.   I was.

9    Q.   And on June 1st in the evening, was that when some

10   protests were going on in Gainesville regarding George Floyd?

11   A.   It was.

12   Q.   All right.  And did you have the opportunity to be

13   involved in an alleged incident involving a marked patrol

14   vehicle from Gainesville Police Department that was on fire

15   on June 2nd?

16   A.   Yes.

17   Q.   And when did you first learn about that, do you recall?

18   A.   Call came out about around 1:00 in the morning that a

19   patrol officer -- I mean patrol vehicle had gotten shot at

20   and was in fire -- was on fire.

21   Q.   And was there any more information about being shot or

22   just being shot at?

23   A.   So all the information from the call was it had got shot

24   at and had got caught on fire.

25   Q.   At the time you first learned about that did you have

1    any idea about how the fire started, or that was the extent

2    of it?

3    A.    That was the extent of it.

4    Q.    What did you do, if anything, when you received this

5    call while you were on duty at 1:00 a.m.?

6    A.    When the call came out I went to the area to start

7    canvassing, because prior to my arrival there had been

8    officers who had got out there and put out the fire, and so

9    we started canvassing the area for possible subjects as the

10   information was coming out.

11   Q.    If you can slow down and try to speak a little clearer.

12   It's very hard with these masks, I apologize.

13   A.    Okay.

14   Q.    What were you canvassing the area for?

15   A.    Well, initially we were making sure that no other patrol

16   vehicles in the area had gotten damaged due to that one

17   getting damaged.  So any other patrol vehicle in the city,

18   such as courtesy officers in different apartment complexes,

19   we went out to make sure that those weren't damaged.  And

20   then as we were doing that we were getting updated BOLOs.

21   Q.    What is a BOLO?

22   A.    A BOLO is be on the lookout for whatever information is

23   given out.

24   Q.    Who did you receive that from?

25   A.    Officers on scene whenever an incident such as this

1   occurs, like in this case it would have been Sergeant Jones.

2   Q.   You receive that from an officer or do you receive them

3   through a medium --

4   A.   So the officer sends it out over the radio to dispatch

5   and dispatch dispatches it as well.

6   Q.   So after 1:00 a.m., when you were canvassing the area,

7   did you receive any BOLOs regarding the incident involving

8   the GPD car on fire?

9   A.   Yes.  It came from Sergeant Jones, who said that the

10  person who was out with the car fire said that it was an

11  older model, classic dark-colored car occupied by multiple

12  people.

13  Q.   So that was a BOLO to be on the lookout for an older

14  model classic car occupied by multiple people?

15  A.   Yes.

16  Q.   And was it -- it was your understanding that car was

17  tied, that lookout for that car was tied to what?

18  A.   To the patrol vehicle being shot at and catching on

19  fire.

20  Q.   Do you recall approximately how many minutes after you

21  heard the call about the patrol car being on fire that you

22  received this BOLO that you just described?

23  A.   Within 10 minutes of it.

24  Q.   Did that cause you to act in any way, receiving that

25  BOLO about the older model, dark-colored car that was

1   occupied by --

2   A.    In that moment just continued canvassing the area.

3   Q.    Were you looking for anything in particular after that

4   BOLO, whereas before you said you were looking for other

5   police cars on fire?

6   A.    Yes.  So any vehicle that would match the description of

7   an older model classic vehicle occupied by multiple people.

8   Q.    Okay.  And what was the traffic like at approximately

9   1:00 a.m. or 1:30 a.m. on June 2nd, 2020?

10  A.    At that time it was very light.

11  Q.    And were you the only GPD officer looking for or

12  canvassing the area following up on that BOLO or were there

13  other ones?

14  A.    No.  There was multiple officers looking.

15  Q.    How do you know that?

16  A.    Well, initially -- so you're self-assigned or get

17  assigned to a call and you can see who all is on that call

18  dispatch notice.

19  Q.    You mentioned dispatch notice.  When you said you heard

20  on the radio, do you receive information regarding BOLOs in

21  other ways or just auditorily?

22  A.    So you get them auditory initially and they type them

23  into dispatch notices so you can look at your calls.

24  Q.    So when you say someone types it in, does that allow you

25  to see them in any way?

1  A.   Yes, you can see them from your computer dispatched in

2  your vehicle.

3  Q.   Did you have a computer in your vehicle that night?

4  A.   I did.

5  Q.   And so is the information contained on the computer

6  screen, does that match the information you're receiving

7  through the radio for --

8  A.   For the most part it does but sometimes dispatch doesn't

9  put all the information in.

10  Q.   You said it was about ten or so minutes that you

11  received that descriptive BOLO about what you were looking

12  for.  What happened next that you recall regarding the

13  burning car?

14  A.   So as we're canvassing the area another call comes out

15  from Thompson Bridge Road, the Tap It Brewery.  The caller

16  tells dispatch that a vehicle, moving vehicle, somebody shot

17  a flare out towards the business and then they heard a

18  gunshot but they didn't give a description of the vehicle or

19  the people.

20  Q.   Are you familiar with the location of Tap It?

21  A.   Yes.

22  Q.   Where is that located?

23  A.   The address, I believe, is 1850 Thompson Bridge Road.

24  Q.   Is that in Gainesville?

25  A.   It is.

1   Q.   In the Northern District of Georgia?

2   A.   Yes.

3   Q.   Are you familiar with where the call came about the GPD

4   car on fire, even though you didn't go out there?  Did you

5   know where that address was?

6   A.   I didn't go out there, but yes.

7   Q.   Where was that?

8   A.   I want to say the address -- well, it's Paces Court.

9   Q.   What is Paces Court?

10  A.   It's an apartment complex.

11  Q.   All right.  And is that in the city of Gainesville?

12  A.   It is.

13  Q.   About, approximately, if you're aware, how far is Paces

14  Court and Tap It from each other?

15  A.   Paces Court from Tap It, four to five miles.

16  Q.   And what happened after -- where did -- what did you do,

17  if anything, after you received a call about this incident

18  occurring at Tap It?

19  A.   So during this incident I was in the area of Otila Drive

20  when Officer Shoemaker actually got dispatched to Tap It.

21       At that time when he was en route to that location he

22  saw a vehicle, which he stated was a dark-colored Crown

23  Victoria driven by white male occupied by multiple people,

24  coming south on 129, E.E. Butler.

25  Q.   And how did you know this information?

1    A.    Because he was relaying it all on the radio.

2    Q.    So you heard it over the radio?

3    A.    Right.

4    Q.    Did that cause you to do anything or act in any way?

5    A.    So as he was giving the direction of travel from where

6    he was going, I started heading in that direction.

7    Q.    And approximately, if you recall, approximately -- well,

8    let me back up.

9          You said that -- did the information from Officer

10   Shoemaker result in another BOLO?

11   A.    Yes.  So he gave out a description of the dark-colored

12   Crown Victoria driven by a white male and having other

13   multiple occupants.

14   Q.    All right.  Approximately what time did that come out,

15   and if you don't recall, how much time had passed?

16   A.    So that happened around -- it was all within an hour

17   from when we got the initial call of the vehicle on fire.  I

18   don't remember exactly how many minutes had passed by since

19   he saw that vehicle reference to the initial call.

20   Q.    Did you -- you're talking about stuff that came across

21   dispatch.  Are they memorialized in any reports?

22   A.    Time frames that were given, like by Officer Shoemaker?

23   Q.    The time frames that come out from the dispatch, that

24   come out to the radio to all the police officers?

25   A.    Yeah, everything that's run over the radio got a time

1   stamp because they usually put them in the call notes.

2   Q.   Can they print those out?

3   A.   Yes, they can.

4   Q.   What is that called?

5   A.   It's just CAD, computer-aided dispatch notes.

6   Q.   Have you had a chance to review the -- you said CAD or

7   computer dispatch notes, right?

8   A.   Yes.

9   Q.   Have you had a chance to review the CAD notes from this

10  incident?

11  A.   I have.

12  Q.   You have, all right.  And I asked you what time the call

13  came out for the burning vehicle at Paces Court and you said

14  approximately 1:00 a.m., correct?

15  A.   Yes.

16  Q.   Do you remember the exact time?

17  A.   1:11.

18  Q.   Okay, you do remember it was 1:11?

19  A.   Uh-huh.

20  Q.   Okay.  What did you do after you heard the BOLO that

21  dispatch sent out based on Shoemaker's information?

22  A.   So once they gave a direction of travel of that Crown

23  Victoria, I started heading east into what Officer Shoemaker

24  said the direction of travel was.  And as I was heading east

25  I started trying to find this vehicle.

1        I end up turning onto Textile Way, where QuikTrip is at,

2    and saw a dark-colored Crown Victoria sitting in the parking

3    lot.  So then I wrapped around QuikTrip and then pulled up

4    next to the Crown Vic, where the white male was in the

5    passenger -- driver's seat, along with multiple other

6    occupants.

7    Q.   So you pulled up at the QT.  What's the address of that?

8    A.   1910 Jesse Jewell Parkway.

9    Q.   And there was a car, a dark-colored Crown Vic with a

10   white male in the driver's seat?

11   A.   Correct, and multiple other occupants.

12   Q.   And approximately what time was that?

13   A.   1:50.

14   Q.   What time?

15   A.   1:50.

16   Q.   1:50, okay.  So you told us that the initial call at

17   Paces Court came out at 1:11, right?

18   A.   Right.

19   Q.   And are you sure about that 1:50 time?  Did you review

20   the CAD report?

21   A.   Yes.

22   Q.   And so 1:50 is what, the time you saw it or the time you

23   called it in?

24   A.   The time I called it in, which was right when I saw it.

25   Q.   And what did you -- how did you call it in?  What did

1   you say when you saw this vehicle parked at QT?

2   A.   I let dispatch know I saw a vehicle matching the

3   description that Officer Shoemaker had given.

4   Q.   You said you pulled in next to it?

5   A.   I pulled in at an angle.

6   Q.   Okay.  Did you block it in?

7   A.   I did not.

8   Q.   All right.  What did you do after you pulled in?

9   A.   After I pulled in I turned on my lights and got out of

10  my vehicle and approached the vehicle.

11  Q.   And when you got out of your vehicle did you have any

12  concerns, if any, for safety for yourself or any other

13  people?

14  A.   Yeah, that the occupants possibly had a weapon.

15  Q.   Why did you think that?

16  A.   Due to the nature of the initial call, a patrol vehicle

17  getting shot at.

18  Q.   All right.  And what type of weapon did you think that

19  you might encounter?

20  A.   A handgun.

21  Q.   And based on that concern, how did you act or how did

22  you approach the car?

23  A.   When I approached the vehicle I had everybody keep their

24  hands where I could see them and I began to speak to the

25  driver and had him step out by himself.

1   Q.   How many people were in the car?

2   A.   It was five total.

3   Q.   Including the driver?

4   A.   Correct.

5   Q.   And when you got out of your car, did you have any

6   cameras that recorded this incident, whether it be in the car

7   or on your person or otherwise?

8   A.   Yes, my body cam.

9   Q.   When did you -- do you recall when your body camera --

10  when you say body cam, you mean body camera, right?

11  A.   Yes, my body camera.

12  Q.   Where was that located on your person?

13  A.   On my chest.

14  Q.   Are you wearing that now?

15  A.   I am.

16  Q.   Right in the middle of your chest?

17  A.   Right.

18  Q.   When is that active?

19  A.   It's active as soon as I begin an interaction with

20  somebody.

21  Q.   What causes it to start recording?

22  A.   I have to double tap it.

23  Q.   When you pulled into the QT did you double tap the

24  camera?

25  A.   I double tapped it as soon as I saw -- as soon as I

1   pulled up next to the vehicle.

2   Q.   And what about any other cameras, did you have any other

3   cameras besides your body camera?

4   A.   My in-car camera, but I don't think it was working.

5   Q.   Okay.  And where does your in-car -- where is your

6   in-car camera located in the vehicle?

7   A.   It's where the rearview mirror is.

8   Q.   Does it face forward or backwards?

9   A.   Faces forwards.

10  Q.   And what causes that to activate?  Do you have to press

11  a button on that?

12  A.   The activation of me either hitting the record button or

13  turning on the lights.

14  Q.   Do you recall hitting the record button?

15  A.   No.

16  Q.   And did you turn on your lights?

17  A.   I did.

18  Q.   Do lights include a siren or --

19  A.   No, just lights.

20  Q.   What color are they?

21  A.   Blue lights.

22  Q.   Blue lights.  Okay, you said that you don't think the

23  vehicle camera was working.  What makes you think that?

24  A.   Well, so the SD card in the in-car camera was always

25  unformatting itself.

1   Q.   What is it, S --

2   A.   Yeah, the memory chip for it.

3   Q.   For the what kind of camera?

4   A.   For the in-car camera.

5   Q.   Had been malfunctioning?

6   A.   Correct.

7   Q.   Okay.  In addition to knowing that that had been

8   happening, did you try to determine whether or not there was

9   any in-car camera footage?

10  A.   Yes.

11  Q.   How did you do that?

12  A.   Looking into the view vault system where it would have

13  been stored.

14  Q.   And did you do anything else besides looking to where it

15  might be?

16  A.   No, sir.

17  Q.   If it existed it would have been there?

18  A.   Correct.

19  Q.   So is there any in-camera footage?

20  A.   Not from what I can find.

21  Q.   And where was your car, which direction was your car

22  facing as it relates to the Crown Vic?

23  A.   It was almost at a T to -- I mean, it was at an angle to

24  the Crown Victoria.

25  Q.   If the camera had been working --

1    A.    You would see the Crown Vic from that angle.

2    Q.    Have you had a chance to review the body cam footage of

3    this incident?

4    A.    Parts.

5    Q.    Okay.  Have you reviewed the part, the body cam footage

6    where you turn the camera on where you pulled in alongside

7    the Crown Vic?

8    A.    Yes.

9    Q.    And have you reviewed the footage for the first several

10   minutes of that?

11   A.    Yes, sir.

12   Q.    And does your body cam camera footage contain all the

13   interactions between you and the individuals that you came in

14   contact with?

15   A.    Yes, it does.

16   Q.    Did you come in contact -- what was the driver's name?

17   Did you determine that?

18   A.    Yes, I did.  He was the first person I talked to.

19   Q.    What was his name?

20   A.    All I remember is the last name being Smallwood.

21   Q.    And do you recall what he looks like?

22   A.    Yeah.  He was the only white male in that vehicle.

23   Q.    You said he was the only white male.  What was the races

24   or ethnicities of --

25   A.    There were some black males.

1   Q.   So the driver was Smallwood, a white male?

2   A.   Correct.

3   Q.   Other occupants were black males?

4   A.   Correct.

5   Q.   Do you recognize the driver that you identified as

6   Smallwood being in the courtroom today?

7   A.   Yes, sir, I do.

8   Q.   And where is he located?

9   A.   He's sitting at the defense table with a Play Station

10  (inaudible) sweater on.

11  Q.   Can you point him out in the courtroom and describe to

12  the Court what he's wearing again?

13  A.   Yeah, a multicolored, white, pink and (inaudible) Play

14  Station sweater.

15       MR. RADICS:  Your Honor, ask the record to reflect he's

16  identified the defendant.

17       THE COURT:  Fair enough.

18  Q.   (By Mr. Radics)  And what was your first contact with

19  Mr. Smallwood that morning?

20  A.   I asked him about his whereabouts.

21  Q.   Was he sitting in the car?

22  A.   He was sitting in the car when I began to speak to him.

23  Q.   Did you approach the car?

24  A.   I did approach the car.

25  Q.   Was his window down or up?

1    A.    I believe it was down.

2    Q.    And what did you say to him?

3    A.    I began asking him about his whereabouts, but before

4    that I believe I asked him to step out of the car.

5    Q.    Did he step out?

6    A.    He did.

7    Q.    At that time what did you ask him?

8    A.    I asked him where he had been and where he had been

9    coming from.  He told me he had been at the Walmart and the

10   CVS prior to coming to that QuikTrip on Textile Way, Jesse

11   Jewell.

12   Q.    Did you determine whose car it was?

13   A.    I did.  I ran the tag.  I want to say it was his

14   vehicle.

15   Q.    When did you run the tag?  Before you got out of your

16   car or sometime after?

17   A.    Sometime after.

18   Q.    Okay.  When you asked him to get out of the car did he

19   get out of the car immediately?

20   A.    Yeah.  He didn't hesitate.

21   Q.    Okay.  And were there other officers around at the time?

22   A.    There were.

23   Q.    How many other officers?

24   A.    I want to say at least, at least two other officers that

25   I can remember.

1   Q.   Did anybody -- where were they -- did they come in one

2   vehicle or two vehicles?

3   A.   Separate vehicles.

4   Q.   Where did they park?

5   A.   On site camera (inaudible) where the position of their

6   vehicles were, except Officer Shannon, who parked to the left

7   of me when I made my initial approach.

8   Q.   Did anybody block in the defendant -- the vehicle the

9   defendant was driving?

10  A.   Not from what I remember.

11  Q.   Okay.  When he got out of the car and you asked him

12  where he had been, did he tell you?

13  A.   He stated he had been at Walmart on Shallowford.

14  Q.   All right.  And did you place him in custody or

15  otherwise detain him in any way at that time?

16  A.   No, sir.

17  Q.   What did you ask next?

18  A.   As I was trying to get his information where he was he

19  also stated he had been to CVS.  I then asked him if I could

20  search his vehicle, to which initially he didn't give a

21  definite answer so I then asked for clarification and he said

22  that I can search his vehicle.

23  Q.   All right, so you asked him to search the vehicle and

24  then you said you asked him again because -- what was the

25  reason you asked him again?

1   A.   Because he didn't say yes or no, he was just kind of

2   re-asking my question about searching the vehicle.

3   Q.   He asked you something?  How much time passed between

4   you said can you search the vehicle and you asked him again

5   can you search the vehicle?

6   A.   Just couple of seconds.

7   Q.   Couple seconds?

8   A.   Yes.

9   Q.   Do you recall his exact response -- your exact question

10  and his exact response?

11  A.   My exact question was if I could search his vehicle, and

12  he said (inaudible) --

13       THE COURT REPORTER:  I'm sorry?

14       THE WITNESS:  My question was if I could search his

15  vehicle.  And he, when he clarified, he said that I could

16  search his vehicle, he said, yeah, you can go ahead and

17  search the vehicle, or you can search the vehicle.

18  Q.   (By Mr. Radics)  So he affirmatively said, yeah --

19  A.   Correct.

20  Q.   -- you can search?  About how much time had passed

21  between when you pulled up next to him and you asked him if

22  you could search the vehicle?

23  A.   It was not long.  Several minutes.

24  Q.   And during the time up till the point when he gave the

25  consent to search the vehicle did you ever have your gun

1   drawn?

2   A.   No, sir.

3   Q.   Did you ever threaten him in any way?

4   A.   No, sir.

5   Q.   Did you make him any promises?

6   A.   No.

7   Q.   Did anyone that you saw have their guns drawn or --

8   A.   No.

9   Q.   -- showing force?

10  A.   No.

11  Q.   But were there concerns about officer safety during the

12  time those officers were out there?

13  A.   There were.

14  Q.   Were there concerns about safety to the public when you

15  approached this vehicle?

16  A.   Yes.

17  Q.   Why was that?

18  A.   Well, like I said, due to the nature that the calls had

19  been coming out of somebody torching a police car and

20  shooting near Tap It.

21  Q.   What was the traffic pattern at the time you pulled in

22  to QT?  Was there a lot of traffic?  Low traffic?

23  A.   No, there was low traffic.  It was light traffic.

24  Q.   Was it any different than other weekend or other nights

25  you have patrolled?

1   A.   No, sir, not around that time.

2   Q.   And is it normal at 1:00, 1:30, 1:45 in the morning to

3   have light traffic around that QT?

4   A.   Yes.

5   Q.   Have you had an opportunity or occasion to review your

6   body cam footage from that night or that morning when you

7   drove into the QT and tapped your body cam to activate?

8   A.   Like I said, yeah, just the first several minutes.

9   Q.   And how did you do that?  How do you get that footage?

10  A.   Besides reviewing -- you, that's the only --

11  Q.   You looked at it in the U.S. Attorney's Office?

12  A.   Correct.

13  Q.   Okay.  And is all your interaction with the defendant

14  contained on that body cam?

15  A.   Correct.

16  Q.   Did you ever turn that body camera off at any time while

17  you were interacting with the defendant?

18  A.   No.

19  Q.   All right.  And after you received permission from the

20  defendant to search the car, did you search it?

21  A.   I did.

22  Q.   Did you have any assistance searching it?

23  A.   I did.  I was assisted by a Hall County deputy.

24  Q.   Did you also, you or any other officers you saw, pat

25  down the defendant or search any of the other passengers in

1   the car for any reason?

2   A.   To make sure they didn't have any weapons on them, so

3   yes.

4   Q.   What was the reason that you did that?  What was your

5   concern?

6   A.   That they might have a weapon on them that was used in

7   the shooting at the police car or near Tap It.

8   Q.   What would be your concern with them still having a

9   weapon while you were there?

10  A.   It could be used against us.

11  Q.   Did any of them -- did the defendant have any weapons on

12  him when you patted him down?

13  A.   No.

14  Q.   Was he in custody when you patted him down?

15  A.   No.

16  Q.   Was he under arrest?

17  A.   No.

18  Q.   All right.  And was he under arrest when you searched

19  the car?

20  A.   No.

21  Q.   About how soon after he granted consent to search the

22  car did you search the car, approximately?

23  A.   Maybe a minute.

24  Q.   Okay.  And was he standing there anywhere around the car

25  while you searched it?

1   A.   Yeah.  All the passengers were around the vehicle from

2   what I remember.

3   Q.   Was the defendant around the vehicle while you searched

4   it?

5   A.   From what I remember, yes.

6   Q.   Okay.  And at any time did the defendant revoke his

7   consent to search or tell you to stop searching the car?

8   A.   No, he did not.

9   Q.   How long in total, approximately, did the search of this

10  car take?

11  A.   That would have been several minutes too, maybe five

12  minutes.

13  Q.   And did you discover anything in the car?

14  A.   He had -- while we were checking for it, the Hall County

15  deputy found the shell casings and then the (inaudible)

16  search I found a flare gun.

17  Q.   Found a flare gun.  Where was that flare gun located?

18  A.   The flare gun was behind the driver's seat in a little

19  pouch.

20  Q.   All right.  Was there anything else located, any

21  electronic devices, things like that?

22  A.   Besides their phones, no.

23  Q.   So phones were located?

24  A.   Correct.

25  Q.   You said a flare gun was located where?

1  A.   In the pouch behind the driver's seat.

2  Q.   Okay.  And was that also found -- it was found during

3  the search.  About how long after the search started was the

4  flare gun found?

5  A.   Couple of minutes.

6  Q.   After the flare gun was found what happened?

7  A.   We were told to take the individuals back to CID in the

8  police department, have the vehicle impounded.

9  Q.   Was anybody arrested?

10 A.   No.  Everybody was just put into patrol cars and taken

11 to --

12 Q.   But were they free to leave at that point?

13 A.   At that point, no.

14 Q.   And was it your understanding they would be arrested or

15 did you not know?

16 A.   Well, since I hadn't spoken to everybody I wasn't a

17 hundred percent sure what was going to happen.

18 Q.   Did you place anybody in handcuffs or put them in a

19 patrol vehicle or was that done by other people?

20 A.   Not from what I remember.

21 Q.   When you found the flare gun did you make other officers

22 aware of what you had found?

23 A.   Yes.

24 Q.   Did that cause them to act in any way?

25 A.   No.  Everybody still remained calm and collected.

 1   Nobody acted a different way.

 2   Q.   What caused the five individuals that were in the car,

 3   what caused them to be placed in the back the police car?

 4   When did that happen?

 5   A.   That happened after the flare gun along with the flares

 6   were found.

 7   Q.   Was there any relation to those two things?

 8   A.   To them --

 9   Q.   The flare guns, the flares being found, and then them

10   being placed in custody?

11   A.   Yes.  Because they were being interviewed by our

12   detectives for further investigation about the incidents that

13   occurred.

14   Q.   Did anybody -- okay, was any other -- you said the flare

15   gun and some flares were found, right?

16   A.   Correct.

17   Q.   They were found in the vehicle?

18   A.   Correct.

19   Q.   And you have had an opportunity to review your body

20   camera footage, right --

21   A.   Up to that point, yes.

22   Q.   -- of that incident at the QT when you parked next to

23   them?  And is that body camera footage that you've reviewed

24   that reflects your approaching the defendant and asking him

25   for consent to search the car, is that a fair and accurate

1   representation of the events that happened on June 2nd at the

2   QT in Gainesville?

3   A.   Yes.

4   Q.   And you provided, you or your office provided that

5   footage to the U.S. attorney -- to the FBI, who then provided

6   it to the U.S. Attorney's Office?

7   A.   Yes.

8        MR. RADICS:   Your Honor, at this time we tender the body

9   camera footage from Officer Cazares at the QT and will submit

10  a disk to the Court.

11       MS. FLEMING:   No objection.

12       THE COURT:   Do you want to proceed and we'll review the

13  exhibit, which I guess will be Government's Exhibit 1, once

14  it's --

15       MR. RADICS:   Yes, tender Government's Exhibit 1, thank

16  you, Your Honor.

17  Q.   (By Mr. Radics)   You may have already said this, but

18  what was the total time between the callout at 1:11 and the

19  time you got to the QT?

20  A.   About 40 minutes.

21  Q.   And approximately how far was the QT from, if you know,

22  how far was the QT from Paces apartments?

23  A.   Five miles.

24  Q.   And have you looked that up?

25  A.   Yes.

1      MR. RADICS:  If I can have one moment, Your Honor.

2      THE COURT:  Sure.

3      (Pause in the proceedings.)

4      MR. RADICS:  I have no more questions, Officer Cazares.

5  Ms. Fleming may have some for you.  Thank you.

6                      CROSS-EXAMINATION

7  BY MS. FLEMING:

8  Q.   Good afternoon, Officer.

9  A.   Good afternoon.

10 Q.   What was your shift on the early morning of June 2nd,

11 2020?

12 A.   It was from 7:00 p.m. to 7:00 a.m.

13 Q.   And how long -- how many days have you -- how many

14 shifts had you worked that week?

15 A.   Well, since we had the protests going on I think I

16 worked just about every day.

17 Q.   So is the 7:00 p.m. to 7:00 a.m., was that your regular

18 shift?

19 A.   Yes.  7:00 p.m. to 7:00 a.m. is regular night shift, so

20 yes.

21 Q.   Mr. Radics asked you about how the information comes to

22 you when it's given to dispatch and you said, I believe, that

23 it comes orally, so you hear it, and then somebody types it

24 into the computer?

25 A.   Correct.

1   Q.   And you said sometimes not all the information gets in
2   there?
3   A.   Correct.
4   Q.   And it's typed in by a human, right --
5   A.   Correct.
6   Q.   -- so there's human error?
7   A.   (Nods head.)
8   Q.   Yes?
9   A.   Correct.
10   Q.   You also testified about there was a shooting at Tap It,
11   which is four or five miles from --
12   A.   From Paces Court.
13   Q.   -- Paces Court.  Do you remember if there was a
14   description of the people involved in the shooting at Tap It?
15   A.   No.
16   Q.   Or of the car at --
17   A.   No, not from what I remember.
18   Q.   And you wrote a report in this case, right?
19   A.   Correct.
20   Q.   How many reports have you written?
21   A.   In my time as a police officer?
22   Q.   With regard to this case.
23   A.   I want to say I wrote two supplementals, I think, one in
24   correction to that one.
25   Q.   I'm sorry, this is the --

1  A.   Two supplementals, two reports.

2  Q.   You wrote two reports in this case?

3  A.   Correct.

4  Q.   One the night of June 2nd?

5  A.   Correct.

6  Q.   And when was --

7  A.   And then one to supplement that.

8  Q.   And what did the supplement say, do you know?

9  A.   It was a correction of one of the errors that I had made

10 in the report.

11 Q.   Do you remember what the error is?

12 A.   I don't remember.

13 Q.   Have you written any other reports?

14 A.   In reference to this, no.

15      MS. FLEMING:  Your Honor, at this time, just for the

16 record, I want to request all reports authored by Officer

17 Cazares pursuant to Rule 26.2.

18 Q.   (By Ms. Fleming)  You had testified earlier that it was

19 relayed on the radio from Shoemaker; is that right?

20 A.   Correct.

21 Q.   The description of the car?

22 A.   Correct.

23 Q.   And you weren't at the corner where Shoemaker was?

24 A.   I was not.

25 Q.   You were some 40 minutes away; is that right?

1   A.   40 minutes away?  No.

2   Q.   Didn't you testify with Mr. Radics that --

3   A.   No.  He asked about the initial call time versus the

4   time that I found him.

5   Q.   And when he was talking about, correct me if I am wrong,

6   the initial call time of Shoemaker calling in the

7   description?

8   A.   No.  The initial call time of when the police car was

9   called in.

10   Q.   Got it, okay.  When Shoemaker related on the radio that

11   he testified earlier the description of the car at the

12   stoplight, where were you?

13   A.   I was coming from (inaudible) --

14        THE COURT REPORTER:  I'm sorry?

15        THE WITNESS:  Otila Drive, I was coming from Otila

16   Drive.

17   Q.   (By Ms. Fleming)  I'm sorry, I cannot understand what --

18   A.   Otila, O-t-i-l-a, Drive.  Coming down Dawsonville

19   Highway towards Jesse Jewell.

20   Q.   How far would you say you were?

21   A.   From QuikTrip?

22   Q.   From where Shoemaker relayed he saw a car on Jesse --

23   stopped at a stoplight.

24   A.   A couple of miles.

25   Q.   Okay.  Do you recall if anybody else responded to

1    Shoemaker's call?

2    A.    I want to say Shoemaker and Officer Schiffer responded

3    to Tap It.

4    Q.    You're saying S-h-i-v-e-r?

5    A.    S-c-h-i-f-f-e-r.

6    Q.    Do you recall if Schiffer eventually appeared at the QT?

7    A.    I didn't -- no, I don't think he did.

8    Q.    So as far as you know, you're the only one who responded

9    to Shoemaker's description of the vehicle stopped at the

10   stoplight on --

11   A.    No, myself and Officer Aguilar.

12   Q.    Aguilar.  What's Aguilar's first name?

13   A.    Shano, S-h-a-n-o.

14   Q.    Was Aguilar at the QT?

15   A.    He was.

16   Q.    Do you know if Aguilar was at the Paces Court?

17   A.    I believe we were all at Paces Court at one point.

18   Q.    But do you recall if Aguilar was?

19   A.    Not a hundred percent.

20   Q.    And Mr. Radics asked you pretty specifically about time

21   of the burning vehicle when the call came in and you said

22   1:11 a.m.?

23   A.    Correct.

24   Q.    How do you remember that?

25   A.    We looked over the call notes.

1  Q.   Sorry?

2  A.   We looked over the call notes.

3  Q.   In preparation for this hearing?

4  A.   Correct.

5  Q.   Okay.  You testified earlier that when you arrived at

6  the QT, I believe you said he pulled alongside your vehicle

7  that we saw?

8  A.   Correct.

9  Q.   But then you said your car was at a T to the vehicle.

10 A.   Uh-huh.

11 Q.   Did you pull up alongside and then move your car --

12 A.   No.  I pulled up at an angle.

13      MS. FLEMING:  Did you get that, Amanda?

14 Q.   Okay.  If you can just wait until I finish, it's really

15 hard for the court reporter to get.

16 A.   Okay.

17 Q.   So my question to you is did you pull up alongside of

18 the vehicle that you saw at QT and then move your car to a T

19 as you described?

20 A.   No.  So I pulled up to it at an angle.  So it wasn't

21 exactly a T, it was more -- I mean it was at an angle.

22 Q.   Okay.  How far away were you from the vehicle when you

23 pulled up to it at the QT?

24 A.   My vehicle was several feet away from the Crown

25 Victoria.

1   Q.   More than 10 feet?

2   A.   Probably.

3   Q.   And when you pulled up to the QT there were multiple law

4   enforcement agencies around; is that right?

5   A.   When I pulled up, after I called out, yes.

6   Q.   Okay.  About approximately how many officers would you

7   say were on scene when you went to approach the vehicle at

8   the QT?

9   A.   When I went to approach the vehicle, if I remember it

10   was me and Officer Aguilar.

11   Q.   Did Aguilar arrive in his own car?

12   A.   Yes, he did.

13   Q.   Did Aguilar approach the car?

14   A.   Yes, he did.

15   Q.   Where is Aguilar from?

16   A.   He's a Gainesville police officer.

17   Q.   Okay, so you and Aguilar approached from different

18   directions?

19   A.   I don't remember exactly which way he approached from

20   because I went straight to where the driver was on the

21   driver's side.

22   Q.   And you testified that you, in response to Mr. Radics's

23   questions, that you were concerned for safety because of the

24   incident at Paces Landing, right?

25   A.   Correct.

1  Q.   But yet you didn't pull out your gun?

2  A.   I did not.

3  Q.   When you approached the car did you have any weapon with

4  you?

5  A.   I didn't have anything taken out of the holster.

6  Q.   Okay.  But you were in full uniform like you are here in

7  court today; is that right?

8  A.   Correct.

9  Q.   With your badge and your body cam and you have a gun

10 belt; is that right?

11 A.   Correct.

12 Q.   And did you have a gun holstered on the gun belt?

13 A.   Yeah.  I mean, everything is the way you see it now,

14 everything was -- well, holstered into where it was supposed

15 to be.

16 Q.   Okay, because you were on duty?

17 A.   Correct.

18 Q.   So you were in full uniform with your gun --

19 A.   Correct.

20 Q.   -- and all the accoutrements of your job?

21 A.   Correct.

22 Q.   And you approached the car and did you have something in

23 your hand?

24 A.   Not that I remember.

25 Q.   You didn't have a flashlight in your hand when you

1    pulled up to the car?

2    A.    I may have but I don't remember exactly.

3    Q.    You don't remember shining a flashlight in the

4    occupants' faces?

5    A.    I probably did.  Like I said, I don't a hundred percent

6    remember.

7    Q.    Okay.  How long have you been an officer?

8    A.    Six years.

9    Q.    Six years?

10   A.    Six years.

11   Q.    If you're approaching a car at 1:00 in the morning when

12   it's dark out, wouldn't that be protocol?

13   A.    If I can see inside the vehicle there would be no need.

14         MR. RADICS:  Objection, that's not in evidence, asking

15   where the lighting was at the location.

16         THE COURT:  I'll allow the question.

17   Q.    (By Ms. Fleming)  I'm asking during your six years as a

18   police officer have you received training?

19   A.    Yes.  But everybody responds to things differently.

20   Q.    I understand.

21   A.    Uh-huh.

22   Q.    And when you're approaching a vehicle and there's some

23   concern for your safety, what is the training that you --

24   what are you told to do?

25   A.    They don't -- so they don't train you on when you should

1   and shouldn't take it out.  I mean, in this case, like I say,

2   I don't remember if I did or didn't take it out but the

3   lighting was pretty decent at the QuikTrip, it's a well-lit

4   parking lot.

5   Q.   Okay.  And so you approached the vehicle and I think you

6   testified earlier that you spoke to the driver; is that

7   right?

8   A.   Correct.

9   Q.   And the driver you described was my client, right?

10  A.   Correct.

11  Q.   You said he was the only white male in the car; is that

12  right?

13  A.   Yes.

14  Q.   And you told him to get out of the car, right?

15  A.   I asked him to step out.

16  Q.   You asked him to step out of the car?

17  A.   Uh-huh.

18  Q.   And stand outside of the car?

19  A.   Right.

20  Q.   And you told him to get his hands out of his pockets?

21  A.   I told him to keep his hands out of his pockets.

22  Q.   And you told him to stand there, right?

23  A.   Correct.

24  Q.   So he was not free to leave at that point; is that

25  right?

1   A.   Not while I investigated.

2   Q.   Sorry?

3   A.   Not while I was trying to figure out if --

4   Q.   That's right.

5   A.   -- that was the vehicle or not, correct.

6   Q.   So if he had decided to get back in the car and drive

7   off, y'all would have chased him, right?

8   A.   Correct.

9   Q.   If he decided to walk away, y'all would have apprehended

10  him, right?

11  A.   Correct.

12  Q.   So he was not free to leave?

13  A.   Correct.

14  Q.   He was detained?

15  A.   Yes.

16  Q.   Okay.  And I know that you said you and Aguilar

17  approached the car, but there were more officers on the

18  scene, were there not?

19  A.   After I called out where we were and who -- and that we

20  were at the suspect vehicle, people started to come in, yes.

21  Q.   And you said you reviewed the body camera footage, parts

22  of it, with the U.S. attorney this morning, right?

23  A.   Correct.

24  Q.   So didn't you see the other officers standing around

25  from multiple law enforcement agencies?

1   A.   Yeah, I said for several minutes of it.

2   Q.   I'm sorry?

3   A.   Yeah, the first several minutes of it were me

4   approaching the vehicle.

5   Q.   Okay.

6   A.   And up to the point that I got his consent, that's where

7   I stopped watching.

8   Q.   I'm sorry, to the point you got what?

9   A.   His consent, Smallwood's consent for the vehicle.

10  Q.   Okay.  But I'm asking you when you approached the

11  vehicle and you were talking to the driver and you asked the

12  driver to stand outside, that's when you were at the QT; is

13  that right?

14  A.   Correct.

15  Q.   And during that, those few minutes, seconds, there were

16  multiple police officers, at least 20, from multiple

17  agencies; is that correct?

18  A.   I mean, I definitely wouldn't say 20, there wasn't 20 of

19  us on the road.  But I don't remember who all was there, I

20  just remember me and Aguilar being there.

21  Q.   I'm sorry?

22  A.   During that moment.

23  Q.   But it was more than just you and Aguilar?

24  A.   Eventually, yes.

25  Q.   Okay, it was more than ten officers; is that right?

1   A.   I can't remember how many officers were there, to be

2   honest with you.

3   Q.   Okay.  But there were five occupants in the car; is that

4   right?

5   A.   There were five people there.

6   Q.   And you directed the other officers to take those five

7   occupants of the car at a point later on to the police

8   station in individual cars, right?

9   A.   I did not; a supervisor did.

10   Q.   Do you know how long your body cam footage was?

11   A.   No, I don't.

12   Q.   Okay.  But you didn't review it in its entirety today;

13   is that right?

14   A.   Correct.

15   Q.   Is it fair to say that you were on the scene at the QT

16   for about an hour?

17   A.   I would say so because we towed the vehicle.

18   Q.   And as you're testifying here today, you don't remember

19   if there was more than ten officers on scene?

20   A.   So there were probably about ten officers on scene.

21   Q.   But it would be fair to say that if body cam footage

22   existed that would be an accurate representation of how many

23   officers were on scene?

24   A.   About ten after I got out with the (inaudible) --

25        THE COURT REPORTER:  I'm sorry, "after"?

1       THE WITNESS:  About ten after I got out of the vehicle,

2    yes.

3    Q.   (By Ms. Fleming)  And to your recollection all of the

4    officers were in full uniform; is that right?

5    A.   Yes.

6    Q.   There were no undercover officers, if you will?

7    A.   No.  Everybody was in uniform.

8    Q.   Everybody was in uniform with a gun belt, guns?

9    A.   Correct.

10   Q.   Everybody displaying their credentials?

11   A.   Uh-huh, yes.

12   Q.   Everybody was fully aware in that vehicle that these

13   were law enforcement officers?

14   A.   Yes.

15   Q.   You had a big presence at the QT that night; is that

16   fair to say?

17   A.   Yes.

18   Q.   I mean, the body cam footage, correct me if I am wrong,

19   it shows y'all took up a lot of space at that gas station?

20   A.   Uh-huh, yes.

21   Q.   So that vehicle was surrounded by all these officers and

22   each officer had its own vehicle that they brought to the

23   scene?

24   A.   Correct.

25   Q.   So while you didn't -- I don't remember the term

1   Mr. Radics used -- while you didn't close them in or

2   something, the officers' vehicles and the officers were

3   surrounding this vehicle, the car and the occupants of the

4   vehicle, correct?

5   A.   Yes.

6   Q.   And at some point you took the identification from

7   Mr. Smallwood; is that right?

8   A.   Yes.

9   Q.   And you ran it?

10  A.   Correct.

11  Q.   And when I say you ran it, you went pack to your car and

12  you called in for the information?

13  A.   I want to say that I did it just over the radio while I

14  was out with him.

15  Q.   I'm sorry, I didn't understand what you said.

16  A.   Yeah, I ran his information.  I want to say I ran it

17  over dispatch, if not in the back of my vehicle, but, yes,

18  but the information was ran.

19  Q.   His information was run?

20  A.   Uh-huh.

21  Q.   Which means that you talked to somebody else, dispatch

22  or police station, to get more information on my client; is

23  that right?

24  A.   Yes.

25  Q.   Do you recall what came back?

 1   A.   No, I don't.  I want to say nothing came back on him.

 2   Q.   Nothing came back, no warrants?

 3   A.   Correct.

 4   Q.   No criminal history?

 5   A.   No.

 6        MR. RADICS:  Judge, I'm going to object, relevance.

 7   This occurred after any alleged consent to search.

 8        MS. FLEMING:  We don't know that, Your Honor.

 9        THE COURT:  Yeah, I'll let her pursue it.  Thank you.

10   Q.   (By Ms. Fleming)  And Mr. Radics asked you if

11   Mr. Smallwood was searched or had a gun or weapons.  Do you

12   remember that?

13   A.   Yes.

14   Q.   Did you search Mr. Smallwood?

15   A.   Did I search Mr. Smallwood?

16   Q.   That's my question.

17   A.   Honestly, I can't remember who I searched.

18   Q.   Okay.  Do you remember asking somebody else to search

19   Mr. Smallwood?

20   A.   No, I don't.  But I want to say that they were searched

21   while I was searching the vehicle, it was done while I was

22   searching the vehicle.

23   Q.   Do you know who searched Mr. Smallwood?

24   A.   I don't.

25   Q.   Do you know if anything was found on Mr. Smallwood's

1  person?

2  A.   From what I remember nothing was found on anybody.

3  Q.   So no weapons were found on Mr. Smallwood?

4  A.   Correct.

5  Q.   No drugs?

6  A.   No drugs, no nothing.

7  Q.   No guns?

8  A.   Correct.

9  Q.   No flare gun?

10  A.   Not from what I remember.

11  Q.   And what you testified to is that you did the actual

12  searching of the car, right?

13  A.   Correct.

14  Q.   And you did that after asking Mr. Smallwood if you can

15  search the car?

16  A.   Correct.

17  Q.   And he hesitated initially?

18  A.   He said he was -- he asked what I was asking about

19  searching his car, he was, like, do I mind if I search your

20  car and then when I asked if I can search the car again in

21  clarification, he said, yes, you can search the car.

22  Q.   So he hesitated, he didn't answer right away when you

23  asked the question?

24  A.   Correct.

25  Q.   He repeated your question --

1   A.   Right.

2   Q.   -- to buy some time, right?

3   A.   I guess.

4   Q.   And you went ahead and searched the car and at that

5   point nobody was sitting in the car, right?

6   A.   Correct.  Everybody had been taken out of the vehicle at

7   that point.

8   Q.   Okay.  And you were assisted in the search of the

9   vehicle; is that right?

10  A.   Yes.

11  Q.   And I believe you testified that it was a Deputy

12  Roberts?

13  A.   Yeah, it was a Hall County deputy.

14  Q.   Was it Roberts?

15  A.   It was Austin Roberts.

16  Q.   And Hall County is different from Gainesville Police

17  Department; is that right?

18  A.   It's two different departments, yes.

19  Q.   So there were multiple agencies on scene at the QT?

20  A.   Yes.

21  Q.   Do you know who else was on scene, what other agency,

22  law enforcement?

23  A.   From what I remember it was just Hall County and

24  Gainesville.

25  Q.   Okay.  Did anybody else assist you in searching the car

1   that night?

2   A.   No.   Just me and Deputy Roberts.

3   Q.   All right.   And I believe that you said, you testified

4   earlier that the flare gun -- that you found a flare gun,

5   excuse me, behind the driver's seat in a pouch; is that

6   right?

7   A.   Correct.

8   Q.   So what you're talking about is the driver's seat has

9   like a pouch, I can't remember --

10  A.   On the back side.

11  Q.   And it was in there?

12  A.   Yes.

13  Q.   Was it in a case?

14  A.   No.   It was just out alone.

15  Q.   Sorry?

16  A.   It was just out in the pouch, there was no case or

17  anything.   It was as is.

18  Q.   Okay.   And the flare gun is plastic, right?

19  A.   Yes.

20  Q.   It was orange?

21  A.   Orange.

22  Q.   And did you find anything else in that pouch?

23  A.   No.

24  Q.   Okay.   What did Deputy Roberts find?

25  A.   Deputy Roberts found flares with the spent casings of

1    flares.

2    Q.   Do you know where those were found?

3    A.   I want to say they were on the rear seat, on the bench

4    seat.

5    Q.   Did you see him find those?

6    A.   No.  He showed them to me.

7    Q.   What else was found in the car?

8    A.   That was all that I remember being found besides cell

9    phones.

10   Q.   Where were the cell phones found?

11   A.   One was found in the front seat.

12   Q.   Any others?

13   A.   That was all -- that's all I remember, just that one

14   cell phone.

15   Q.   And all of this would have been described in your police

16   report; is that right?

17   A.   Sorry, what was that?

18   Q.   All of this evidence that you found would have been

19   described in your police report; is that right?

20   A.   Correct.

21   Q.   So if it's not in your police report, it didn't happen?

22   A.   Correct.

23   Q.   And then you testified most recently that you were told

24   to take the occupants of the car to CID, I think I heard you

25   say?

1    A.    Correct.

2    Q.    Who told you that?

3    A.    The supervisor, I want to say it was Lieutenant Beck.

4    Q.    And he wasn't on scene, right?

5    A.    He got on scene a little bit later.

6    Q.    But when he told you to take them back to CID?

7    A.    No, he would have been on scene at that point.

8    Q.    Okay.  And if you were on the body cam footage telling

9    the officers to transport each one of the five individuals in

10   separate cars, did you just forget that?

11   A.    No, because that's not what I would do.  That's what a

12   supervisor would do.

13   Q.    Did you transport any of the five individuals that

14   night?

15   A.    Yes.

16   Q.    Which one?

17   A.    I want to say I transported Bailey.

18   Q.    Did you ever talk to Jesse Smallwood other than what you

19   just testified to in approaching the vehicle?

20   A.    No.

21   Q.    Sorry?

22   A.    No.

23   Q.    At all on June 10th?

24   A.    After that point, no.

25   Q.    Once you left the QT you never talked to him again?

1   A.   Right.  We left him in the care of CID.

2   Q.   So you never read Mr. Smallwood his Miranda rights; is

3   that right?

4   A.   No, I did not.

5   Q.   Did you ever hear another officer read the Miranda

6   rights to Mr. Smallwood?

7   A.   I wasn't around him at the point, he was with another

8   officer, so no, I did not.

9   Q.   So the answer is no?

10  A.   Correct.

11  Q.   So you never witnessed another officer speaking to

12  Mr. Smallwood on June 2nd of 2020?

13  A.   I know he was with another officer but I don't remember

14  who.

15  Q.   When was that?

16  A.   After searching the vehicle and all that.

17  Q.   And would that be on the body cam footage?

18  A.   Everything should be on the body cam.

19  Q.   Do you remember seeing Mr. Smallwood with another

20  officer on the body cam footage?

21  A.   Yeah, but I don't know who he was with.

22  Q.   Sorry?

23  A.   Yeah, but I don't remember which officer he was with.

24  Q.   Okay.  So other than what you testified to here about

25  the flares and the spent casings and the cell phones found in

1   the car, there were no drugs found in the car?

2   A.   No, there was not.

3   Q.   No other contraband?

4   A.   There was not.

5   Q.   Nothing else illegal?

6   A.   No.

7   Q.   In fact, a flare gun is not illegal, right?

8   A.   No, it's not.

9   Q.   What did you do with the flare gun after you found it?

10   A.   Packaged it into an evidence bag.

11   Q.   And who did you give it to and where did you take it?

12   A.   It was taken to Gainesville Police Department and placed

13   into evidence.

14   Q.   And do you know what happened to it after that?

15   A.   No, I don't.

16   Q.   Do you know if it's ever been fingerprinted?

17   A.   I don't.

18        MS. FLEMING:  Your Honor, if I can just have one moment?

19        THE COURT:  Sure.

20        (Pause in the proceedings.)

21        MS. FLEMING:  We have no further questions.  Thank you,

22   Officer.

23        MR. RADICS:  Just brief redirect.

24        THE COURT:  Yes.

25                          REDIRECT EXAMINATION

1    BY MR. RADICS:

2    Q.    Officer Cazares, you said that when you arrived at the

3    QT and pulled in at an angle to the defendant's car you were

4    the first officer there, right?

5    A.    Correct.

6    Q.    And then you said Aguilar joined you?

7    A.    Yes.  He pulled in right behind me.

8    Q.    And you were asked about the number of other officers

9    there and it sounded like there at some point were several

10   other officers there, correct?

11   A.    Correct.

12   Q.    Now, did they all arrive at the exact same time you did

13   or did they arrive at different times during the course of

14   your interaction?

15   A.    They arrived at different times.

16   Q.    And initially did you say the only person you remember

17   being there when you approached the car was Aguilar?

18   A.    Yes, Officer Aguilar.

19   Q.    And did you request consent to begin to search the car

20   shortly after arriving?

21   A.    Yes.

22   Q.    And would you agree sometime during the course of your

23   search that other officers arrived?

24   A.    Yes.

25   Q.    You said that these defendants, specifically the

1   defendant Mr. Smallwood, when you were searching the car was

2   not free to leave; is that right?

3   A.   I'm sorry, when I was free to -- when they were free to

4   leave?

5   Q.   When you were searching the car you said he was not free

6   to leave, correct?

7   A.   Correct.

8   Q.   But was he restrained in any way?  Did he have handcuffs

9   on him?  Was anybody holding him --

10  A.   No.

11  Q.   -- against his will?

12  A.   No.

13  Q.   You just weren't going to let him leave, correct?

14  A.   Correct.

15  Q.   Did anybody tell him he couldn't leave and that he was

16  in custody?

17  A.   No, sir, not from what I remember.

18  Q.   All right.  You said -- you testified as to what was

19  found.  Are you testifying as to everything that was found or

20  just what was found by you?

21  A.   Just what was -- well, everything that was found, spent

22  casings, the flare gun, the cell phone.

23  Q.   You found the cell phone, right?

24  A.   Correct.

25  Q.   Were there other cell phones found that evening or are

1   you aware of any?

2   A.   I think other cell phones that were found were on each

3   of the other individual persons.

4   Q.   So when you were testifying about what you know was

5   found, you were talking about what was in the car?

6   A.   Yes.

7   Q.   And tell us again what was that.

8   A.   It was the flare gun, some spent casings, and cell

9   phone.

10  Q.   And one cell phone?

11  A.   Yes.

12  Q.   Now, you weren't -- you said you weren't present when

13  someone may or may not have read Smallwood Miranda rights,

14  right?

15  A.   Correct.

16  Q.   But you didn't read him Miranda rights, correct?

17  A.   I did not.

18  Q.   And no one read him any Miranda rights prior to you

19  requesting consent to search, correct?

20  A.   Correct.

21  Q.   Did he appear to be under the influence of any alcohol

22  or drugs?  And when I say "he," Smallwood, when you asked him

23  for consent to search and you were interacting with him after

24  initially approaching his car.

25  A.   No.  He seemed to be in all his senses.

1   Q.   Did he appear to have any language barrier with you?

2   A.   No.

3   Q.   Did he appear to have any physical or mental

4   disabilities when he gave you consent to search?

5   A.   No.

6   Q.   You made a statement that, when asked about what your

7   body camera would show, and you said everything.  If your

8   body camera was on right now what area would it be able to

9   record?

10  A.   It's got a pretty broad view, so I mean everything

11  that's pretty much in front of me.

12  Q.   Would it be able to record anything behind you?

13  A.   No.

14  Q.   Okay.  So when you were using your body camera on this

15  night in question, what areas is it going to be recording?

16  A.   Everything in front of me.

17  Q.   And that is why?  It's recording everything in front of

18  you because why?

19  A.   I mean, that's what it records, it's a front-facing

20  camera.

21  Q.   Is there any camera on your back?

22  A.   There's no camera on my back.

23  Q.   Okay, so when you talk about what your body camera is

24  going to contain, does it contain everything that happened at

25  the QT or does it contain things that were going on in front

1   of you?

2   A.   Things that were going on in the front of me.

3   Q.   And is your body camera going to contain things that

4   were going on outside of its area of focus?

5   A.   It's not.

6   Q.   Okay.  So if I ask you what footage your body camera

7   contains, would you say everything that happened at QT that

8   night?

9   A.   No.  It's everything pretty much directly in front of

10  me.

11  Q.   When you responded "everything" to Ms. Fleming, what

12  were you -- why did you say that?

13  A.   Why did I say that?

14  Q.   Why did you say it contained everything that happened at

15  QT?

16  A.   Well, I was talking about everything that happened in

17  front of me.

18       MR. RADICS:  Those are all my questions, thank you.

19       THE COURT:  Ms. Fleming?

20       Ms. Fleming:  I have no further questions, Judge.

21       THE COURT:  Officer Cazares, you may be excused.

22       MR. RADICS:  Subject to Exhibit 1, which has been

23  admitted, and we will follow up on, we rest, we have no more

24  witnesses.

25       THE COURT:  All right, thank you.

1          Do you have anything you need to add, Ms. Fleming?

2          MS. FLEMING:  No, Your Honor.

3          THE COURT:  Okay.  I noticed in your motion,

4   Ms. Fleming, you asked for the right to amend up following

5   the hearing and I'm not sure I'm going to hold you to that

6   since it's probably been a little while since you filed it.

7   Do you want an opportunity to go first on briefing once the

8   transcript is in?

9          MS. FLEMING:  Sure.

10         THE COURT:  Okay.  Well, I know schedules are a little

11   unpredictable at this moment as we get things going again,

12   but would you want 14 or 21 days from the submission of the

13   transcript to file your initial amended motion?

14         MS. FLEMING:  I'd like 21 days from the transcript.

15         THE COURT:  14 or 21 is what I'm asking.

16         MS. FLEMING:  21.

17         THE COURT:  Okay, 21.  We'll give the government 21 to

18   respond and then a 14-day reply period for Ms. Fleming.

19         In doing that, too, Ms. Fleming, if you were going to,

20   if you felt like you needed to do anything with the motion to

21   sever when you file the amended --

22         THE COURTROOM DEPUTY:  They're all gone.

23         MR. RADICS:  All four other defendants have been set for

24   a plea.

25         THE COURT:  All of them, then that's mooted, we'll do

1    that in the minutes.  I thought there was still one hanging

2    out there.  So that was all that was left besides -- the

3    statements is going to be referred to Judge Jones per his

4    practice.

5         All right, did y'all catch that?  Candidly I know we

6    kind of got in the ballpark of it, but Judge Jones, I always

7    defer any motions to suppress statements to him, even though

8    y'all kind of got in the neighborhood of that today, that's

9    purely a question for him.

10        I think that about does it.  Was there anything else

11   from the government's perspective, Mr. Radics?

12        MR. RADICS:  No, Your Honor, thank you.

13        THE COURT:  Ms. Fleming, anything else from the defense

14   perspective?

15        MS. FLEMING:  No, Your Honor.

16        THE COURT:  All right, thank you y'all.

17        (Proceedings adjourned at 12:30 p.m.)

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT:

5    NORTHERN DISTRICT OF GEORGIA:

6

7              I hereby certify that the foregoing pages, 1

8    through 93, are a true and correct copy of the proceedings in

9    the case aforesaid.

10             This the 20th day of May, 2021.

11

12

                           /s/ *Amanda Lohnaas*
13             _____

14                         Amanda Lohnaas,
                           Official Court Reporter
15                         United States District Court

16

17

18

19

20

21

22

23

24

25